1
2
3
4
5
6                    IN THE UNITED STATES DISTRICT COURT

7                       FOR THE DISTRICT OF ARIZONA

8
9   UNITED STATES OF AMERICA,      )        No. CR 09-658-DCB (CRP)
                                   )
10              Plaintiff,         )
                                   )        REPORT AND RECOMMENDATION
11  vs.                            )             ON MOTIONS TO
                                   )           SUPPRESS EVIDENCE
12  ARMANDO RENE PADILLA,          )
                                   )
13  DANIEL THOMAS,                 )
                                   )
14              Defendants.        )
    _____)
15

16          Pending before the Court are Defendants' two motions to suppress evidence.  (Docs

17  28, 57).  Defendant Thomas filed the original motion to suppress evidence, in which

18  Defendant Padilla later joined.  (Docs 28, 57).  In this motion, Defendants contend the law

19  enforcement officer did not have the requisite reasonable suspicion to stop their vehicle.

20  In the second motion, Defendant Padilla additionally argues that the law enforcement

21  officer did not have consent or probable cause to search his vehicle.  (Doc 57).  The

22  Government contests the motions arguing the officer did have reasonable suspicion to stop

23  Defendants' vehicle and also had probable cause to search the vehicle after talking to the

24  driver, Defendant Padilla.  For the reasons discussed infra., the Magistrate Judge

25  recommends that the District Judge, after his independent review, GRANT the Motion to

26  Suppress based on an illegal stop of Defendants' vehicle (Doc 28) and DENY the Motion

27  to Suppress based on lack of probable cause for the search of Defendants' vehicle (Doc

28  57).

**EVIDENTIARY HEARING**

The Magistrate Judge held an evidentiary hearing on these motions on January 26, 2010 and February 2, 2010. (Docs 69, 79). The record contains transcripts of these proceedings. (Docs 76, 84). In the evidentiary hearing, the Government produced the following witnesses to support its position:

1.  Officer Leonard Henry, patrol officer and K-9 officer employed by Tohono O'odham Police Department for the last 6 years. Officer Henry is authorized to enforce both tribal and state traffic laws. He is also Defendant Thomas's first cousin.

2.  Special Agent Leander Mase, senior special agent employed by Immigration and Customs Enforcement (ICE) for the last 23 years to investigate drug and illegal alien incidents.

**FACTUAL FINDINGS**

As Officer Henry testified on direct examination, on the night of Friday, March 27, 2009 he was assigned to patrol the Sells, Arizona area. Around 8:49 p.m. Officer Henry was traveling west on Highway 86 at approximately milepost 121. (TR 1/26/10, page 11.) Highway 86 is a two-lane highway, one lane for eastbound traffic and one for the westbound traffic. The lanes are approximately 12-feet wide with a one-foot wide shoulder, one slight curve at milepost 120, and a speed limit of 65 mph on that part of Highway 86. A white fog line separates the driving lane from the shoulder. (TR 1/26/10, page 18.)

Officer Henry described numerous potential hazards on that stretch of Highway 86. The road is dark with no street lights along the road and no light from adjacent businesses. Highway 86 is an "open range", open to cattle crossing and active pedestrian or foot traffic and hitchhiking. Officer Henry testified pedestrian traffic is especially high on Fridays. (TR 1/26/10, page 18.) As Officer Henry testified, that evening there was a

heavy westbound automobile traffic and moderate eastbound traffic. (TR 1/26/10, page 18.)

On direct examination, Officer Henry testified he was traveling westbound at about 60 mph when he saw a vehicle driving eastbound which in Officer Henry's visual observation was traveling at a low rate of speed. Officer Henry activated his radar at approximately milepost 120, which showed that the speed of the Defendants' vehicle was 54 mph (11 mph less than the maximum speed limit on this part of Highway 86). (TR 1/26/10, page 13.) After noting the speed, Officer Henry testified that he slowed down to approximately 54 mph when he bypassed the Defendants' vehicle in order to get a description and the color of the vehicle. (TR 1/26/10, page 64.) As he bypassed the vehicle, he testified that he observed through the rear view mirror that the vehicle's license plate light was not on. (TR 1/26/10, page 75.) On direct examination, Officer Henry testified that he made a U-turn "once the vehicle bypassed [him]". (TR 1/26/10, page 16.) On redirect, Officer Henry testified that after he made the U-turn, it initially appeared that the license plate light was not on, but when Officer Henry caught up to the Defendants' vehicle, his own vehicle's lights were lighting up the back of the Defendants' car, so that Officer Henry was not able to determine if the license plate light was on. (TR 1/26/10, page 101.) After he stopped the vehicle, Officer Henry noticed that the license plate lamp was actually on, but it was "tucked up" into the frame so that the light coming out of the lamp was dim. (TR 1/26/10, page 76.)

After Officer Henry made a U-turn, he sped up to catch up to the Defendants' vehicle. (TR 1/26/10, page 64.) To position his patrol car directly behind Defendants' vehicle, Officer Henry passed one car that was traveling behind the Defendants' vehicle. (TR 1/26/10, page 86.) When Officer Henry's car caught up to the Defendants' vehicle, he testified he was traveling a car to a car and a half length behind the Defendant's vehicle. (TR 1/26/10, page 65.) At that point, the Defendants' vehicle moved to the far right side of the roadway and started driving on the white fog line. (TR 1/26/10, page

19.)  Officer Henry admitted on cross-examination that in his oral report to Special Agent Mase he assumed that Defendant Padilla's maneuver might have indicated his desire to allow the police vehicle to pass.  (TR 1/26/10, page 65.)

At the evidentiary hearing Officer Henry was inconsistent in using terms to define Defendant Padilla's way of driving on the fog line.  On direct, Officer Henry stated that the vehicle drove "on and along" the fog line.  As pointed out on cross examination, "on and along" description was consistent with his report.  But, Officer Henry expanded this description on direct.  In addition to describing Defendants' vehicle as driving "on and along", he also said the vehicle "did not drive straight along the fog line, [i]t drove *on and over*." (TR 1/26/10, page 19.) (Emphasis added).  Further, on cross-examination and redirect examination, Officer Henry testified that by saying "on and along" the fog line he meant "back and forth" and "on and over" the fog line".  (TR 1/26/10, page 67-68 and 99.)  During cross-examination, Officer Henry admitted that he did not indicate weaving of the Defendants' vehicle in his report.  (TR 1/26/10, page 67.)

Defendant Padilla's driving along the fog line bears significance to Officer Henry's later assertion that he stopped the vehicle, in part, because he suspected DUI.  Officer Henry testified on direct examination, that given his prior experience and DUI officer training, driving at a low speed rate and driving along the fog line can both indicate DUI.  (TR 1/26/10, pages 20-21.)  Officer Henry asserted that Defendant Padilla's low rate of speed and his driving along the fog line were possible signs of intoxication.  Officer Henry made this assertion even while he admitted on cross examination that in his oral report to Special Agent Mase he indicated that the purpose of Defendant Padilla's driving along the fog line might have been just to allow the police vehicle to pass.  (TR 1/26/10, page 65.)  Officer Henry also admitted on cross examination that there were numerous potential hazards on this highway that night.  (TR 1/26/10, page 35.)  Moreover, after the stop Officer Henry found no signs of drinking or intoxication.  (TR 1/26/10, page 36.)

The position of Officer Henry's patrol vehicle in relationship to the Defendants' vehicle was also discussed in the evidentiary hearing. According to Officer Henry's testimony, the Defendants' vehicle drove on the fog line for approximately 2 miles between mileposts 121 and 123. (TR 1/26/10, pages 20 and 66.) Officer Henry did not testify at any point that he was driving along the fog line too. On cross examination, Officer Henry testified he was staying on the road while following the Defendants' vehicle. (TR 1/26/10, page 90.) Defendant Thomas's counsel pointed out that if Defendant Padilla's car was on the fog line and Officer Henry's vehicle was in the driving lane, the two vehicles would be positioned at an angle to each other and not directly one behind the other. (TR 1/26/10, page 26.)

On direct examination Officer Henry testified that while following the Defendants' vehicle, he observed Defendant Padilla not wearing a seatbelt. Driving on a dark road, with no street lighting, Officer Henry testified he was able to observe through the rear window of Defendant Padilla's car that the seatbelt was in vertical position, as opposed to being over the driver's shoulder across his chest area. (TR 1/26/10, page 22.) These observations were made five times when five cars traveling westbound at approximately 65 mph were illuminating the inside of the Defendants' vehicle with a "constant stream of light". (TR 1/26/10, page 71.)

Defendants' counsel inquired into the numerous distractions Officer Henry faced when allegedly observing Defendant Padilla's seatbelt. Officer Henry testified on cross examination that simultaneously with watching Defendants' vehicle driving on the fog line, he was also checking Defendants' vehicle's speed on his radar, its position relative to the road, his own speed, watching the road and the oncoming traffic, and Defendant Padilla's not wearing a seatbelt. (TR 1/26/10, pages 90-91.) These observations were made in less than a minute, given that Officer Henry was driving at 54 mph, he started following Defendants' vehicle at milepost 121 and activated his siren and lights at milepost 122, and within this period of time he had to pass one car that was traveling

behind Defendants' vehicle. Moreover, while making these observations, Officer Henry was driving within the driving lane, while Defendant Padilla was driving along the fog line, to the far right of Officer Henry's vehicle. Also, Officer Henry testified that he was observing all of the above through a windshield that had numerous visual barriers, including the radar box, the radar antenna, and the rearview mirror. (TR 1/26/10, page 89.) On direct examination Officer Henry testified that in his prior experience he had made the same observations during night time in similar conditions. (TR 1/26/10, page 22.)

In support of Officer Henry's seatbelt observations, the Government presented photographs taken in the course of a reenactment held by Officer Henry and Special Agent Mase on May 6, 2009. (Exhibits 5 through 9.) As indicated by Special Agent Mase on cross-examination, he arranged the reenactment at his own initiative because he was not sure if Officer Henry in fact saw the seatbelt as he said he did. (TR 1/26/10, pages 141-142.)

At the evidentiary hearing, testimony was heard regarding the limitations of the reenactment. On direct examination Officer Henry admitted that the reenactment photographs were taken in a location different than Highway 86. (TR 1/26/10, page 23.) On cross-examination, Special Agent Mase testified that the road where the reenactment took place had no fog line (TR 1/26/10, page 145.) and no center line. (TR 1/26/10, page 147.) In addition, in the instant case Defendant Padilla's vehicle was driving on the fog line, while Officer Henry's car was driving in the travel lane. Thus, Defendant Padilla's car was positioned to the far right of Officer Henry's car. As confirmed by the testimony of Special Agent Mase on cross-examination, the reenactment photographs were taken so that Defendant Padilla's vehicle was located directly in front of Officer Henry's patrol car. (TR 1/26/10, page 145.)

Moreover, in the photographs the vehicles are stationary and lighted by a stationary car positioned in the opposite direction, so that the light illuminating the inside

of the vehicle is constant.  In the instant case, both vehicles were traveling at 54 mph, the vehicles driving in the opposite direction were presumably traveling around the posted 65 mph speed.  The light illuminating Defendant Padilla's vehicle from inside would have been brief moving glimpses of light lasting altogether around 5 seconds.  (TR 1/26/10, page 72.)  Furthermore, as Special Agent Mase testified on cross-examination, the vehicle used for the oncoming traffic was an SUV; however, it is unclear from Officer Henry's testimony if the cars traveling westbound on the night of March 27, 2009 were also SUVs.  (TR 1/26/10, page 149.)

As Officer Henry testified on direct examination, after he had observed that the Defendant Padilla was not wearing a seatbelt, he conducted a registration check and then, approximately at milepost 122, activated his emergency lamps and siren.  (TR 1/26/10, page 33.)  Prior to activating his lights, Officer Henry had followed Defendants' vehicle for approximately one mile.  The Defendants' vehicle slowed down, drove for approximately 200 yards passing two large clearances and stopped at approximately milepost 123.  (TR 1/26/10, pages 33-34.)  On cross-examination Officer Henry testified that it took 10 to 15 seconds for Defendant Padilla to stop the vehicle after Officer Henry activated his police lights and siren.  (TR 1/26/10, page 74.)  On direct Officer Henry testified that because Defendant Padilla passed two large clearances where, in Officer Henry's opinion, Defendant Padilla could have stopped the car, his driving for 200 yards after Officer Henry activated the police lights and siren constituted another traffic violation - failure to yield to a law enforcement officer.  (TR 1/26/10, page 34.)  Traveling at approximately 54 mph as testified to by Officer Henry, he followed Defendants' vehicle for approximately 200 yards.  (TR 1/26/10, page 72.)  Defendant Padilla then stopped the vehicle at approximately milepost 123.  Officer Henry testified that Defendant Padilla did not speed up or try to avoid him.  (TR 1/26/10, page 74)

After the vehicle of Defendant Padilla stopped, Officer Henry exited the patrol unit and approached the vehicle on the driver's side.  Using his flashlight he looked at the

back seat of Defendant Padilla's vehicle where he saw a large square object occupying about a half of the back seat covered by a multicolored blanket. Based on his training and field experience, Officer Henry believed that was a common way of concealing illegal drugs by smugglers. (TR 1/26/10, pages 33-34.)

Officer Henry approached Defendant Padilla and asked him for his driver's license, his vehicle registration, and asked him if he was "okay" to determine if the driver had been drinking any alcohol. Then, Officer Henry observed that the seatbelt was not on and asked Defendant Padilla if he knew that the law requires the driver to have the seatbelt fastened. Defendant Padilla answered, "Oh, yeah." Officer Henry explained to Defendant Padilla that he stopped the car for the low speed rate, unlit license plate, driving on and along the fog line, and not wearing a seatbelt. (TR 1/26/10, pages 35-36.)

On direct examination Officer Henry admitted that he did not mention the license plate to Special Agent Mase in his oral report as one the factors for the stop. (TR 1/26/10, page 77.) Officer Henry did not include the problem with the license plate and his suspicion of DUI in his report because he thought "they were unconfirmed". (TR 1/26/10, page 104.)

Officer Henry testified that he did not see that the passenger in the car was his first cousin, Daniel Thomas up until the moment of the arrest. On cross-examination, Officer Henry admitted that based on his experience, he was supposed to identify people in cars as part of his job to secure officer's safety. Officer Henry confirmed that he saw two occupants in the Defendant Padilla's vehicle, but claimed to not notice one of occupants was his first cousin. (TR 1/26/10, page 96.)

Once Defendant Padilla started gathering his documents, Officer Henry leaned towards the open window, inhaled the air that was coming out, stuck his face and nose as close to the window as possible and detected an odor of raw marijuana coming from the inside the vehicle. Officer Henry immediately ordered Defendant Padilla to step out and

go to the back of the car. Defendant Padilla exited the car and told Officer Henry about the registration and ownership of the vehicle.

At this point, Officer Henry inquired if Defendant Padilla was a member of Tohono O'odham Nation, and Defendant Padilla responded that he was a member of Pascua Yaqui Tribe. (TR 1/26/10, pages 38-39.) On redirect examination Officer Henry testified that the question of the Indian status of Defendant Padilla was not his first question because in his view it did not matter if Defendant Padilla was a member of Tohono O'odham Nation. Officer Henry believed the violations at issue were both tribal and State law violations. (TR 1/26/10, page 103.)

Next, Officer Henry asked Defendant Padilla for his consent to search the vehicle. Officer Henry explained that he was a K-9 officer and had a dog trained to alert to illegal narcotics. He asked Defendant Padilla if he had illegal drugs in his car to which Defendant Padilla replied that he had marijuana in the vehicle on the back seat of the car. (TR 1/26/10, pages 40-41.) Officer Henry opened the vehicle, lifted up the multicolored blanket and found a sack which he recognized as a bale with raw marijuana. Officer Henry arrested Defendant Padilla and Defendant Thomas, placed them in handcuffs, and asked Defendant Padilla if he had anything else in the trunk. (TR 1/26/10, page 42.) Defendant Padilla answered "no". (TR 1/26/10, page 42).

Meanwhile, the back-up officers, Officer Traviola and Elk Dreamer arrived and Defendant Padilla was placed in the caged portion of Officer Traviola's patrol unit. Then, Officer Henry exercised a K-9 sniff of the exterior of the car. (TR 1/26/10, page 43.) The dog immediately jumped in the compartment of the Defendant Padilla's car and alerted presence of illegal narcotics. Next, Officer Henry let the dog out of the car and the dog gave an alert for illegal drugs near the trunk of Defendant Padilla's vehicle. Officer Traviola assisted Officer Henry to find the key to the trunk which was eventually found in a tear of the upholstery of the seat of the vehicle. (TR 1/26/10, page 44.) Inside the trunk the officers found four large burlap sacks. Because there was a strong odor of

marijuana coming out of the trunk, Officer Henry testified on direct examination that he realized that the sacks contained raw marijuana.  (TR 1/26/10, page 45.)

The Government contends that at that moment Officer Henry smelled the odor of marijuana he had probable cause for initiating the search of the vehicle.

**ANALYSIS**

**Reasonable Suspicion**

Under the Fourth Amendment, a police officer cannot stop a vehicle without a reasonable suspicion of criminal conduct at the time of the stop.  *United States v. Rodriguez*, 976 F.2d 592, 594 (9th Cir. 1992).  Reasonable suspicion is established when specific, articulable facts, together with objective and reasonable inferences, form the basis for suspecting that a person has committed or is about to commit a crime. *United States v. Salinas*, 940 F.2d 392, 394 (9th Cir.1991).  To establish that a reasonable suspicion exists, the courts look into "totality of circumstances-the whole picture" where the government officers can refer to their past experience and training to articulate how their factual observations triggered their good-faith belief that criminal activity was afoot. *United States v. Cortez*, 449 U.S.411, 417-418 (1981).  The burden of citing the "specific and articulable facts" is borne by the Government, while the burden of proof on the motion to suppress evidence lies with the Defendant. *United States v. Willis*, 431 F.3d 709, 715 n. 5 (9th Cir.2005).

In the case in question, Officer Henry cited the following factors to support reasonable suspicion: (1) that the car was driving 10 MPH below the speed limit, (2) that the car was driving two miles on and along the fog line (a line separating the right lane from the shoulder).  Officer Henry testified that these factors suggested that Defendant Padilla might be driving while intoxicated.

Officer Henry testified that based on his training  intoxicated drivers tend to drive slower than the normal pace of traffic and also use the fog line as their guide. (TR 1/26/10, page 20.)    Thus, Officer Henry testified that he became suspicious of a possible

DUI violation when he observed a Defendants' car driving 11 mph below the speed limit and traveling along the fog line. However, these two factors are insufficient to form basis for reasonable suspicion.

First, Defendant Padilla's speed appears reasonable and prudent given the potential hazards on Highway 86 on that Friday night. Arizona traffic law sets out maximum speed limits provided, where there are specific hazards, drivers are required to drive at a lesser speed rate. A.R.S. §28-701 (B). In the instant case Highway 86 had no street lights, heavy pedestrian or foot traffic, risk of cattle crossing, and right-of-way fences along the roadway. (TR 1/26/10, page 18.) These factors represented special hazards at this part of the highway which justified the reduced speed rate of the Defendant. In addition to the special hazards, driving 54 mph in a 65 mph speed limit zone is not necessarily unlawful or unsafe driving. Furthermore, Officer Henry testified that he was traveling 60 mph along that portion of the road, only 6 mph faster than the Defendant and also below the posted speed limit.

Second, Defendant Padilla's decision to drive along the fog line appears to be a direct response to Officer Henry making a U-turn, passing the vehicle behind Defendants' vehicle and traveling one car to one and a half car lengths behind Defendants' vehicle. As the facts show, driving along the fog line was a prudent decision by the driver. Officer Henry started following the Defendants' car by making a U-turn and passing the car behind the Defendants. In this situation Defendants' movement to the right side of the road in order to let the officer's vehicle pass was reasonable and not indicative of criminal behavior. The most significant testimony that this was a reasonable decision was Officer Henry's statement to Officer Mase that he believed Defendant Padilla drove along the fog line to allow Officer Henry to pass his vehicle as Officer Henry had just passed the vehicle behind the Defendants' vehicle. Officer Henry did not have the requisite reasonable suspicion to stop the Defendant's vehicle for suspicion of DUI.

The other facts cited by Officer Henry are not indicative of criminal activity - failure to have a well-illuminated license plate and failure to wear a seat-belt - do not suggest criminal activity. Officer Henry's testimony that Defendant Padilla failed to yield for 200 yards is also not indicative of criminal activity. Per Officer Henry's testimony, Defendant Padilla stopped his vehicle within 10 to 15 seconds and he did not speed up or try to avoid Officer Henry's vehicle. Taking ten to fifteen seconds to pull over on a dark two-lane road with a narrow one-foot shoulder is not excessive or suspicious.

The Magistrate Judge recommends that the District Judge find that Officer Henry lacked the requisite reasonable suspicion to stop the Defendants' vehicle.

**Pre-textual Stop**

The Government argues that if Officer Henry lacked reasonable suspicion to stop the Defendants' vehicle, he was permitted to stop the vehicle based on traffic violations committed by Defendant Padilla.

When an officer has a reasonable suspicion that a traffic violation has occurred, it does not matter if the officer had some other motive for stopping the car. See *Wren v. United States*, 517 U.S. 806, 817-819 (1996); *United States v. Willis*, 431 F.3d 709, 723 (9th Cir.2005). An officer can initiate a "pre-textual" stop and pull over a vehicle for a traffic violation when the intent is for another purpose, such as suspicion that a driver is trafficking drugs. However, for such a pre-textual stop to be valid, two requirements must be met: (1) the police officer must be able to provide "specific, articulable facts" to justify reasonable suspicion of the traffic violation, and (2) the stop should be a "run-of-the-mine" traffic violation stop. *Willis*, 431 F.3d at 723. To satisfy reasonable suspicion, the traffic violation conduct must in fact be prohibited by law. The mere belief of the police officer that a certain conduct constitutes a traffic violation - while in fact it does not - should not be taken into account when deciding whether reasonable suspicion existed. See *United States v. Lopez-Soto*, 205 F.3d 1101, 1106. To make a stop an

ordinary, "run-of-the-mine" traffic violation stop, the traffic violations must at least be mentioned by the police officers, or a traffic citation must be issued. See *United States v. Willis*, 431 F.3d 709, 725.[1] In the case in question, Officer Henry indicated four alleged traffic violations.

To determine whether reasonable suspicion existed for the alleged traffic violations, this Court must analyze Officer Henry's credibility as to each of those violations. The Ninth Circuit lists seven factors a factfinder should consider in determining the credibility of a witness. The jury instruction on credibility states:

> In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.
>
> In considering the testimony of any witness, you may take into account:
>
> 1. the opportunity and ability of the witness to see or hear or know the things testified to;
>
> 2. the witness's memory;
>
> 3. the witness's manner while testifying;
>
> 4. the witness's interest in the outcome of the case and any bias or prejudice;
>
> 5. whether other evidence contradicted the witness's testimony;
>
> 6. the reasonableness of the witness's testimony in light of all the evidence; and
>
> 7. any other factors that bear on believability.
>
> The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify.

Model Crim. Jury Instr. 9th Cir. 1.8 (2003). A district court cannot reject a Magistrate Judge's credibility determination without conducting a de novo evidentiary hearing. *United States v. Ridgway*, 300 F.3d 1153, (9th Cir.2002), *aff'd United States v. Hernandez-Acuna*, 498 F.3d 942, 944 (9th Cir.2007). A district court can accept a

---

[1]Although in this case Officer Henry issued no citations for traffic violations, just like the officer in *Willis*, Officer Henry's report contained some of the alleged traffic violations (except for the unlighted license plate) and his questions after stop were related to the traffic violations.

magistrate judge's credibility determination without conducting a de novo evidentiary hearing. *United States v. Raddatz*, 447 U.S. 667, 680 (1980).

The Court will address the four alleged traffic violations and Officer Henry's credibility as to each of those violations.

**Driving Below the Speed Limit**

Under Arizona traffic laws, a person shall not drive a motor vehicle at a speed that is less than the speed that is reasonable and prudent under the existing conditions. A.R.S. §28-701. The Government did not present any evidence that driving 54 mph in this 65-mph zone on Highway 86 was not reasonable and prudent. Officer Henry testified to significant potential hazards along Highway 86 on the night he pulled over the Defendants' vehicle. When asked if there was any special hazard, Officer Henry stated "Highway 86 at the Nation is a open range, which means there's cattle present. There's also pedestrian or foot traffic that walk along the roadway. There also is right-of-way fences along the roadway." (TR 1/29/10, page 18). When asked if there was any special hazard on that particular evening, Officer Henry stated "[i]t was a Friday night. Nighttime, there's always pedestrian or foot traffic hitchhiking." (TR 1/29/10, page 18). Officer Henry previously described Highway 86 as dark with no street lights and no light from adjacent businesses. (TR 1/29/10, page 12). He also testified that Highway 86 has a couple of curves in the section at issue in this case and traffic eastbound was moderate with traffic westbound heavy on the night in question. (TR 1,29/10, pages 12-13). Given these hazards, when asked whether Defendant Padilla's speed of 54 mph was justified, Officer Henry appears to begin to answer yes and then inexplicably answers that it was not reasonable. He testifies, "[y]es, it – for the conditions, 54 miles an hour, the amount of traffic, it was too slow for the traffic. There was a, they could get into impeding traffic, and cause a road hazard." (TR 1/29/10, page 18).

Taking into account all the specific hazards existing at that time on that part of Highway 86 as identified by Officer Henry himself, this Court is not convinced that

Defendant Padilla's driving 54 mph was violating the law. In fact, it appears such a speed was reasonable and prudent. Officer Henry's testimony that 54 mph was too slow or impeding traffic is incredible given the laundry list of hazards he identified.

In addition to contending that Defendant Padilla's speed was in violation of Arizona law, the Government also argued that Defendant Padilla violated Tohono O'odham Nation law, which states that vehicles cannot impede even one car. The Court finds the Government's argument insincere. First, Officer Henry never cited the Tohono O'odham law that Defendant Padilla was impeding traffic. Officer Henry never made any notes that Defendant Padilla was impeding traffic and he never discussed with Defendant Padilla a concern that he was impeding traffic. Thus, no evidence was presented that Defendant Padilla was impeding traffic. The only evidence that even suggests another car was close to Defendant Padilla's vehicle was the testimony that Officer Henry passed one vehicle before traveling closely behind the Defendants' vehicle.

Second, the Court finds it difficult to imagine how a law stating that impeding one vehicle is a traffic violation could be enforced. Such a law could give officers the ability to pull over almost any vehicle if it had another vehicle traveling behind it. This is not logical. What is there to indicate that both cars do not want to travel at the same speed? What about two cars traveling the speed limit? Or, two family members traveling in tandem? Are those incidents violations of reasonable and prudent speed and illegally obstructing traffic? The evidence does not support a conclusion that Defendant Padilla violated any traffic law when he traveled 54 mph in a 65 mph zone on Highway 86 on the night in questions with the specific hazards identified.

**Driving Along the Fog Line**

Under Arizona traffic laws, when a roadway is divided into two or more clearly marked lanes for traffic, the driver should drive as nearly as practicable entirely within a single lane and shall not move the vehicle from that lane until the driver has first

ascertained that the movement can be made with safety. A.R.S. §28-729.[2]  The words "as nearly as practicable entirely" have been interpreted by Arizona state courts so as to exclude "brief, momentary, and minor deviations outside marked lines". See *State v. Livingston*, 206 Ariz. 145, 148 (2003) and *Bliss v. Treece*, 134 Ariz. 516, 519, 658 P.2d 169, 172 (1983).

In the Ninth Circuit, touching for approximately ten seconds but not crossing the fog line does not constitute a traffic violation. *United States v. Colin*, 314 F.3d 439 (9th Cir.2002). Other courts have found no traffic violations for brief driving on the fog line when interpreting statutes nearly identical to § 28-729(1). See *United States v. Gregory*, 79 F.3d 973, 978 (10th Cir.1996), *Rowe v. State of Maryland*, 363 Md. 424, 769 A.2d 879, 889 (2001), *State v. Tarvin*, 972 S.W.2d 910, 912 (1998). In *Rowe* even crossing over the fog line – when made briefly – did not constitute a traffic violation justifying the stop. *Rowe v. State of Maryland*, 769 A.2d 879, at 887-88.

In the instant case, the Defendants' vehicle drove along the fog line for approximately two miles according to Officer Henry. Traveling at a speed of 54 mph, Defendant Padilla drove along the fog line for approximately 2.2 minutes. According to the testimony of Officer Henry on cross-examination, the Defendants' vehicle moved over to the fog line only after Officer Henry made his U-turn, sped up to catch the Defendants' vehicle, passed the car traveling behind the Defendants' vehicle and began closely following (a car to a car and half length behind) the Defendants' vehicle. (TR 1/26/10, pages 64-65). It is worth noting that Officer Henry passed the vehicle behind the Defendants' vehicle while all three vehicles were traveling on a two-lane highway with

[2]Officer Henry testified at the evidentiary hearings that Highway 86 is a "two-lane highway, one eastbound lane, one westbound lane". (TR 1/26/2010, page 12.) It is clear from the wording of the statute that it applies to roadways where there are two or more lanes for traffic moving in the same direction. It is unclear if this statute applies to roads where there is only one lane of traffic going in one direction, and the other lane going in the other direction. Nevertheless, even if it applied, the court finds the conduct of the Defendants in the instant case lawful and justified for the reasons set out further.

moderate traffic in their direction and heavy traffic in the westbound lane. Although no testimony was provided as to how Officer Henry passed the vehicle behind the Defendants' vehicle, it seems evident that either that vehicle moved to the right to allow him to pass or Officer Henry aggressively entered the westbound lane of traffic to pass. In his oral report to Agent Mase, Officer Henry told Agent Mase that Defendant Padilla driving along the fog line could have been in response to Officer Henry following closely behind the Defendants' vehicle; Defendant Padilla's attempt to allow Officer Henry to pass his vehicle as Officer Henry had just done with the vehicle behind the Defendants' vehicle. (TR 1/26/10, p 64-65).

The evidence does not support that Defendant Padilla's driving along the fog line was a traffic violation. While people may drive along the fog line for various other reasons such as intoxication or fatigue, those were not the reasons in this case. The actual reason in this case is evident and testified to by Officer Henry. The evidence shows, in fact, that Officer Henry was the cause of Defendant Padilla's driving along the fog line. Per Officer Henry's own testimony, Defendant Padilla moved his vehicle over to the fog line after Officer Henry made the U-turn, sped up, passed the vehicle behind Defendant Padilla's vehicle and began traveling in close proximity to the Defendants' vehicle. Moving to the right side of the road to allow an officer, who has just passed the vehicle behind your vehicle in moderate to heavy traffic, appears to this Court to be a reasonable and prudent choice and not a violation of the law.

Most disturbing to this Court is Officer Henry's changing description of Defendant Padilla's driving along the fog line. On cross examination, Officer Henry testified that in his initial report after stopping the Defendants' vehicle he described Defendant Padilla driving "on and along" the fog line. (TR 1/26/10, p 67). This description aligns with Officer Henry's statement to Agent Mase that Officer Henry believed Defendant Padilla could have moved over to the fog line to allow Officer Henry to pass the Defendants' vehicle. Defendant Padilla moved his vehicle over to the fog line as a conscious choice.

Officer Henry observed Defendant Padilla move his vehicle to the right after Officer Henry exhibited driving behaviors that could have suggested he intended to pass the Defendants' vehicle - making a U-turn, accelerating, and passing, in significant traffic, the vehicle directly behind the Defendants' vehicle. It makes sense that a conscious choice, Defendant Padilla's choice to move to the right of the highway, would lead to a description of Defendant Padilla driving "on and along" the fog line.

The description that does not make sense to this Court and erodes Officer Henry's credibility is Officer Henry's description at the evidentiary hearing. When the prosecutor asked Officer Henry to describe how Defendant Padilla was driving on the fog line, Officer Henry stated "[o]nce the vehicle pulled to the right, it began driving on and along that fog line basically just traveling with its front and rear tire on the passenger's side just straddling the line, and then driving on and over it along it." (TR 1/26/09, page 19). Officer Henry began his answer with a description that is consistent with his initial description of Defendant Padilla making a conscious choice to move to the right of the road and driving along the fog line. But, then he goes further and adds that Defendant Padilla was driving on and over the fog line, suggesting possible weaving. The prosecutor then asked Officer Henry "[d]id the wheels perfectly follow the fog line?" (TR 1/26/09, page 19). Officer Henry answered "[n]o." (TR 1/26/09, page 19). The prosecutor continued, "[s]o was the vehicle moving in the lane and then outside of the lane crossing the fog line?" (TR 1/26/09, page 19). After an objection, the Court intervened and asked Officer Henry how the vehicle moved along the fog line. Officer Henry testified "[i]t did not drive straight along the fog line, along the fog line. It drove on and over just in a continuous motion traveling eastbound." (TR 1/26/09, page 19).

Officer Henry's expanded description of Defendant Padilla's driving along the fog line was further inquired into on cross examination. Officer Henry admitted on cross examination that he did not include in his report nor verbally inform Agent Mase that Defendant Padilla weaved, swerved, or veered in his driving on and along the fog line.

(TR 1/26/10, page 67).  Officer Henry testified that his description on direct of Defendant Padilla driving back and forth and around the fog line was the same as his description in his report of Defendant Padilla driving on and along the fog line.  The following is the dialogue between Officer Henry and Defendant Thomas's defense attorney on cross examination:

> Q    On direct you stated that [Defendant Padilla] was going back and forth kind of on and over the fog line is what, is how you described it?
> A    Yes.
> Q    You did not put that in your report?
> A    He was driving on and along the fog line, yes.
> Q    So – but you didn't indicate anything in your report about him going back and forth and kind of moving around on that fog line?
> A    That would be, to me, on and along the fog line.
> Q    So that to you that means the same thing?
> A    Yes.

 (TR 1/26/10, pages 67-68).

The Court finds Officer Henry did not testify credibly about Defendant Padilla's driving along the fog line.  As he admitted, in his report Officer Henry described driving on and along the fog line - a behavior indicative of a conscious choice to move to the right of a highway to allow an officer to pass.  When pressed at the evidentiary hearing, Officer Henry's original description of driving basically along the fog line morphs into driving that crisscrosses the fog line and sounds like weaving and behavior that is not a conscious choice.  No evidence, except Officer Henry's changing testimony, supports a description of Defendant Padilla driving back and forth over the fog line.  If Defendant Padilla had driven back and forth across the fog line in a way similar to weaving, as a trained officer, this Court presumes, Officer Henry would have included that description in his report and not withheld it until the evidentiary hearing on a motion to suppress evidence.

//

**License Plate Illumination**

Officer Henry testified that before he made a U-turn, he noticed that " the license plate light was not lit" on the Defendants' vehicle, which was one of the reasons why he stopped the vehicle.  (TR 1/26/10, page 16.)

Under Arizona law, the rear license plate must be illuminated by a white light lamp, so that the plate would be clearly legible from a distance of fifty feet to the rear.  A.R.S. §28-925 (C).  Thus, the lamp should not only be lit, but should be bright enough to allow seeing the license plate at a distance of fifty feet.

At the evidentiary hearing Officer Henry testified that he first noticed the license plate was unlit in his rear view mirror when he was traveling westbound and the Defendants' vehicle was traveling eastbound.  (TR 1/26/10, pages 16, 75).  Officer Henry stated that the license plate was not legible from the distance of fifty feet in violation of Arizona law. (TR 1/26/10, page 16.)   Officer Henry allegedly made this observation as the Defendants' vehicle bypassed his vehicle traveling in the opposite direction while both vehicles were traveling at 54 mph.  The prosecutor asked Officer Henry if he could still see the unlit license plate lamp after he made the U-turn.  In response, Officer Henry testified "[f]rom the initial distance when I initially started behind the vehicle, it appeared to be not on and lit, but by the time I got up to it my lights were already lighting up the entire back..."  (TR 1/26/10, pages 100-101).  On cross examination, Officer Henry admitted he did not state in his report that he first observed an unlit light when he bypassed the Defendants' vehicle.  (TR 1/26/10, page 75).  Officer Henry also admitted that he did not list the alleged unlit license plate light as one of the factors for stopping the Defendants' vehicle when he provided an oral report to Agent Mase.  (TR 1/26/10, page 77).  Officer Henry also testified that after he stopped the Defendants' vehicle he checked the license plate light and determined that the light was in fact lit but "tucked up" so that it appeared to Officer Henry to not be lit.  (TR 1/26/10, page 76).

The Court does not find Officer Henry's testimony regarding the license plate light credible. Most problematic for the Court is Officer Henry's assertion that he first made this observation while traveling in the opposite direction of the Defendants' vehicle. While both cars were traveling, per Officer Henry's testimony at 54 mph, Officer Henry asks this Court to believe he saw that a license plate light was not lit to a distance of 50 feet as required by Arizona law. Traveling at that speed in opposite directions, Officer Henry would have had only a split second to view through his rearview mirror the alleged license plate light violation. It is not believable that he made this observation. In fact, the license plate light was actually lit. Furthermore, Officer Henry testified that after making the U-turn, while he was accelerating to catch up to the Defendants' vehicle and while he was passing the vehicle behind the Defendants' vehicle, Officer Henry was somehow able to observe the license plate light not on before his headlights shone to brightly on the back of the Defendants' vehicle. Again, this is not feasible. Officer Henry's credibility is further undermined by the fact that he did not list an unlit license plate light as one of the reasons he stopped the Defendants' vehicle when he was providing his report to Agent Mase.

**Seatbelt Violation**

Officer Henry testified that he stopped the Defendants' vehicle, in part, because he observed that the driver, Defendant Padilla, was not wearing a seatbelt. Under Arizona law, a peace officer shall not stop a person operating a motor vehicle on a highway without wearing a seatbelt, unless the peace officer has reasonable cause to believe that there is another alleged violation of a motor vehicle law of Arizona. A.R.S. §28-909(C). Thus, not wearing a seatbelt does not constitute a primary reason for stopping a vehicle.

Assuming that all other alleged traffic violations did not constitute violations under Arizona law, Officer Henry was not entitled to stop the Defendants' vehicle solely because Defendant Padilla was not wearing a seatbelt in violation of Arizona law. However, since the vehicle was stopped within the territory of the Tohono O'odham

reservation, the Government argues that the traffic laws of the Tohono O'odham tribe are applicable. According to Section 1001 of the Tohono O'odham Traffic Code (Title 23 of the Tohono O'odham Code), a law enforcement officer may stop a vehicle and issue a citation for failure to wear a seatbelt "upon having reasonable cause to believe there is a violation". Section 1001 (C) of the Tohono O'odham Traffic Code.

Counsel for the parties dispute whether tribal law, specifically a Tohono O'odham seatbelt law, can apply to non-tribal members and whether Officer Henry had an obligation to make an initial inquiry into the tribal status of Defendants after he stopped their vehicle. (See Doc 28, p 5-6; Doc 37, p 11-13). Both sides cite a recent Ninth Circuit case and a relatively recent United States Supreme Court case in support of their positions. *See Bressi v.* Ford, 575 F.3d 891 (9th Cir.2009), *United States v. Lara*, 541 U.S. 193 (2004). Neither case involved a routine traffic stop.

*Bressi* addressed a DUI roadblock on a state highway crossing the Tohono O'odham Nation Indian Reservation. 575 F.3d at 893. In dicta, the Court opined that a practical approach should be taken in considering tribal law enforcement officers' ability to stop vehicles for violating tribal law. Because a tribal officer initially has no way of knowing whether a driver is an Indian or non-Indian the Court suggested "[t]he solution is to permit the officer to stop the vehicle to determine first whether or not the driver is an Indian." *Bressi*, 575 F.3d at 896. The Court suggested such an approach would permit tribal officers to exercise tribal law against Indians and that a brief stop would be a relatively minor intrusion or inconvenience to a non-Indian motorist. *Bressi*, 575 F.3d at 896. It is unclear from the dicta in *Bressi* whether a stop is unconstitutional if the tribal officer asks about tribal status after other questions or assumes tribal status.

The second case cited by the parties addresses a criminal assault of a federal officer occurring in Indian country. *Lara*, 541 U.S. at 196. In *Lara*, the defendant was a nonmember Indian who was prosecuted for the assault under tribal law of another Indian Nation and then later prosecuted in federal court. *Lara*, 541 U.S at 196-197. As part of

its holding, the Court determined tribes could prosecute nonmember Indians. *Lara*, 541 U.S. at 210. Thus, the Government in the case before this Court contends the Tohono O'odham Nation had full authority to stop Defendant Padilla's car and enforce the seatbelt violation against him as he is a member of the Pascua Yaqui Tribe.

As a member of the Pascua Yaqui Nation, it is clear that Tohono O'odham tribal jurisdiction applies to Defendant Padilla. 25 U.S.C. § 1301. However, the evidence shows that Officer Henry made no initial attempt to determine if Defendant Padilla was subject to the "courts of Indian offenses." *Id.* The testimony showed that Officer Henry did not inquire into tribal membership of either Defendant until he asked numerous other questions and was concluding his conversation with them. The Court will not address this constitutional issue as there is another dispositive nonconstitutional ground available. *City of Los Angeles v. County of Kern*, 581 F.3d 841, 846 (9th Cir.2009) ("a federal court should not decide federal constitutional questions where a dispositive nonconstitutional ground is available").

The critical issue, which this Court will address, is whether Officer Henry had reasonable cause to believe Defendant Padilla was not wearing a seatbelt before the stop was made. This issue rests on the credibility of Officer Henry and the evidence presented at the evidentiary hearing. The Court finds Officer Henry's testimony incredible and not supported by the evidence offered.

Officer Henry testified that he made five separate observations that Defendant Padilla was not wearing a seatbelt. (TR 1/26/10, page 71). The facts show there are numerous reasons why it is not feasible that Officer Henry made these observations. First, these observations were made in less than a minute, given the facts as testified to by Officer Henry - that both vehicles were traveling at 54 mph, that Officer Henry started following Defendants' vehicle at milepost 121 and activated his siren and lights at milepost 122, and that within this period of time Officer Henry passed one car that was traveling behind Defendants' vehicle. Second, these observations were allegedly made

solely by the light cast from five vehicles traveling in the opposite direction, westbound, along the highway. (TR 1/26/10, page 71). When questioned about the light on cross examination, Officer Henry stated that the light from the oncoming traffic cast a "constant stream of light" into the interior of the Defendants' vehicle. (TR 1/26/10, page 71). Third, while making these observations, Officer Henry was driving within the driving lane, while Defendant Padilla was driving along the fog line, to the far right of Officer Henry's vehicle. Thus, Officer Henry would have needed to view (from a significant angle) the driver's side of the Defendants' vehicle while that vehicle was traveling to the far right of his own vehicle. Fourth, Officer Henry faced numerous distractions, visual and otherwise, while he allegedly made these observations. Officer Henry testified on cross examination that while making the seatbelt observations, he was simultaneously watching Defendants' vehicle driving on the fog line, checking Defendants' vehicle's speed on his radar, monitoring his own speed, watching the road and watching the oncoming traffic. (TR 1/26/10, pages 90-91.) Also, Officer Henry testified that he was observing all of the above through a windshield that had numerous visual barriers, including the radar box, the radar antenna, and the rearview mirror. (TR 1/26/10, page 89.) Fifth, during this same one minute, Officer Henry testified that he conducted a registration check on the Defendants' vehicle. (TR 1/26/10, page 33).

In a minute's time, in light cast only by oncoming traffic, at a sharp angle, with numerous visual distractions, while making other observations, and conducting a registration check of the Defendants' vehicle it is not credible that Officer Henry actually saw Defendant Padilla not wearing his seatbelt.

The reenactment photographs offered by the Government do not convince this Court that Officer Henry saw what he now claims. At the evidentiary hearing, numerous testimony was heard regarding the limitations of the reenactment. First, the photographs were not taken on Highway 86; in fact, they were taken on a road that does not even have a fog line or a center line. (TR 1/26/10, pages 23, 145, 147). Second, the vehicles were

positioned one directly in front of the other rather than the actual position of Officer Henry's vehicle in the driving lane and the Defendants' vehicle to the far right on the fog line. (TR 1/26/10, page 145). Third, the photographs were taken with stationary vehicles, not vehicles traveling approximately 65 mph, as Officer Henry testified the oncoming traffic was traveling. (TR 1/26/10, pages 70, 72). Thus, this Court has no way of discerning how the light from oncoming traffic would appear in the interior of the Defendants' vehicle as the oncoming traffic bypasses the Defendants' vehicle. While Officer Henry testified that it was a constant stream of light from oncoming traffic, he also testified that the five cars illuminating the Defendants' vehicle were all about a car length behind each other. (TR 1/26/10, page 71). Thus, Officer Henry described the light illuminating the interior as "so it'd be about a second [after the first vehicle], the second vehicle another second, so just a steady stream of cars behind each other." (TR 1/26/10, page 71). When asked how long Officer Henry observed the driver while each car was illuminating the interior, Officer Henry testified he viewed the driver and lack of a seatbelt for about five seconds. (TR 1/26/10, page 72). Thus, unlike the reenactment photographs, Officer Henry did not have a steady stream of light but at most, had only five second flashes of light into the interior of the Defendants' vehicle. Furthermore, as Special Agent Mase testified on cross-examination, the vehicle used for the oncoming traffic was an SUV; however, it is unclear from Officer Henry's testimony if the cars traveling westbound on the night of March 27, 2009 were also SUVs. (TR 1/26/10, page 149.)

The Government need only show one traffic violation for a legitimate pretextual stop. As discussed above, there was no license plate light violation, speed violation, crossing the fog line violation or failure to pull over in response to the emergency lights. That Defendant Padilla in fact violated the seatbelt requirement is undisputed. What is disputed is whether Officer Henry knew about the violation before or after the stop. The timing of his knowledge rests solely on Officer Henry's credibility.

As the investigating officer in this case, Officer Henry has an interest in the outcome of the case. As discussed in detail above, in many instances, Officer Henry's testimony concerning the license plate light, speeding, crossing the fog line and failure to pull over was not credible and not consistent with his prior written and verbal statements and not consistent with the evidence. On those four violations, Officer Henry simply was not credible.

When Officer Henry testifies about the seatbelt, his credibility does not start with a clean slate. Rather, Officer Henry's willingness to stray from the facts on these related issues leads to the conclusion that he would be similarly unconstrained by the actual facts when testifying about the seatbelt. This Court finds that Officer Henry's testimony was not credible. As such, the Government has not satisfied its burden of proof that Officer Henry observed the seatbelt violation, the silhouette of the belt hanging vertically, prior to stopping the vehicle driven by Defendant Padilla.

The Magistrate Judge recommends that the District Court grant the motion to suppress evidence based on lack of reasonable suspicion for the traffic stop. Officer Henry did not have reasonable suspicion that any criminal activity was afoot when he stopped the Defendants' vehicle. Furthermore, Officer Henry's assertions that he stopped the Defendants' vehicle for independent traffic violations are not credible and are not supported by the evidence presented at the hearing.

**Probable Cause**

If the original stop in this case was justified, then the question is whether the search conducted after the stop was legal. Law enforcement officers are permitted to search a vehicle without a warrant if probable cause for the search exists. Probable cause exists when there is a set of facts within knowledge of the officers sufficient to make a reasonable and prudent person believe that an offence is being committed. See *Carroll v. United States*, 267 U.S. 132 (1925); *Brinegar v. United States*, 338 U.S. 160 (1949); *Husty v. United States*, 282 U.S. 694 (1931).

In the case in question there is no doubt that Officer Henry had probable cause to search the Defendants' vehicle after he smelled an odor of marijuana. Officer Henry testified that he smelled the odor of marijuana as he was standing at the driver's side door while Defendant Padilla was gathering his documents. Officer Henry explained that he got his face and his nose as close as possible to the window of the vehicle, and, being well familiar from previous experience with the odor of illegal narcotics, he was able to recognize that the odor coming out of the vehicle was that of marijuana. That alone gave Officer Henry a probable cause to believe that a crime was being committed. *U.S. v. Leazar*, 460 F.2d 982, 984 (9th Cir.1972); *Fernandez v. U.S.*, 321 F.2d 283, 287 (9th Cir. 1963).

Even if Officer Henry did not have probable cause to search the vehicle at that time, he definitely had probable cause when Defendant Padilla told Officer Henry that he had marijuana in his backseat of the vehicle. (TR 1/26/10, pages 38-41.). See *U.S. v. Smith*, 790 F.2d 789, 792 (9th Cir.1986) (where the statement of codefendant which indicated that counterfeiting materials were located in defendant's jeep provided probable cause to search the jeep).

The Magistrate Judge recommends that the District Judge deny the motion to suppress evidence based on lack of probable cause.

**RECOMMENDATION**

The Magistrate Judge recommends that the District Judge, after his independent review, GRANT Defendants' Motion to Suppress Evidence based on lack of reasonable suspicion to stop the Defendants' vehicle (Doc 28) and DENY Defendant Padilla's Motion to Suppress Evidence based on lack of probable cause to search the Defendants' vehicle (Doc 57).

Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections within fourteen days of being served with a copy of the Report and

Recommendation.  If objections are not timely filed, they may be deemed waived.  The parties are advised that any objections filed are to be identified with the following case number: **CR 09-658-DCB**.

DATED this 3rd day of March, 2010.

CHARLES R. PYLE
UNITED STATES MAGISTRATE JUDGE