# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ARMANDO RENE PADILLA,<br>DANIEL THOMAS,<br><br>Defendants. | No. CR 09-658-DCB (CRP)<br><br>**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS STATEMENTS** |

Pending before the Court is Defendant Thomas's Motion to Suppress Statements. (Doc 29). The Court held an evidentiary hearing on the motion on January 26, 2010 and February 2, 2010. (Docs 69, 79). Based on the testimony presented at the evidentiary hearing the Magistrate Judge recommends the District Court DENY the motion.

**EVIDENTIARY HEARING**

The court held an evidentiary hearing on the motion to suppress statements filed by Defendant Daniel Thomas. (Doc 29.) Defendant argues that his *Miranda* rights waiver and statements made after that were not made voluntarily, knowingly, and intelligently. The Government contends the Defendant waived his *Miranda* rights and made his

statements voluntarily, knowingly, and intelligently.  In the evidentiary hearing, the Defendant produced the following witnesses to support his position:

1. Defendant Daniel Thomas.

2. Jeanette Thomas, Defendant's mother.

3. Dr. James Allender, neuropsychologist.

The Government produced the following witnesses:

1. Special Agent Leander Mase, senior special agent employed by Immigration and Customs Enforcement (ICE) for the last 23 years to investigate drug and illegal alien incidents.

2. Tohono O'odham Police Department (TOPD) Corrections Officer, Juventino Leon.

3. TOPD Corrections Officer, Shonty Remon.

4. Dr. Richard Hinton, psychologist.

**FACTUAL FINDINGS**

On direct examination Special Agent Mase testified that on March 27, 2009 he was the duty agent in Sells, Arizona.  As the duty agent, he was required to respond to calls that happen within his territorial area after working hours and during the weekends.  (TR 1/26/10, page 109.)  The night of the incident, around 9:00 p.m., he received a call from TOPD Sergeant David Gray who informed Agent Mase that Officer Henry stopped a vehicle containing marijuana and took two persons, who were later identified by Agent Mase as Daniel Thomas and Armando Rene Padilla, into custody.  (TR 1/26/10, page 109.)  Agent Mase asked Sergeant David Gray to bring these persons to his office in Sells, Arizona, and headed towards his office.  He arrived at his office at around 9:45 p.m.

//

After his arrival, Agent Mase secured Defendant Thomas and Defendant Padilla in separate holding cells. (TR 1/26/10, page 111.) Defendant Thomas asserts during his detention he suffered severe headaches and nose bleeds. On direct, Agent Mase testified that the Defendants' cells were located 20 feet away from his desk, 15 feet away from the interview room, and about 10 feet away from the place where the vehicle was parked outside. He testified that he would have been able to hear Defendant Thomas if he complained about anything. Agent Mase testified Defendant Thomas did not complain about anything during the period of his detention and Agent Mase did not observe any signs of headaches or nosebleeds. (TR 1/26/10, page 115 and 121.)

After having secured Defendant Thomas and Defendant Padilla, Agent Mase processed the evidence. He took photographs of the vehicle (around 10:00 pm), searched the vehicle and weighed the marijuana (around 10:18 pm), conducted criminal checks of both Defendants and registration check of the vehicle (around 10:18 pm). (TR 1/26/10, page 112.) While conducting the criminal check of the Defendants, Agent Mase found that Defendant Thomas was previously involved in two incidents involving illegal narcotics. (TR 1/26/10, page 113.)

Once the evidence was processed, Agent Mase interviewed Officer Henry and both Defendants. Agent Mase first interviewed Officer Henry and then interrogated Defendant Padilla for a little over an hour until approximately 2:00 a.m. (TR 1/26/10, page 115.)

At approximately 2:26 a.m., Agent Mase started interviewing Defendant Thomas. (TR 1/26/10, page 116.) Agent Mase advised Defendant Thomas of his *Miranda* rights by reading out loud the Immigration and Customs Enforcement statement of rights in English and providing a copy of the statement to Defendant Thomas. On direct, Agent Mase testified that as he read the rights, Defendant Thomas followed along on the written copy Agent Mase provided to him. Defendant Thomas then signed the statement of rights and the waiver form. (TR 1/26/10, page 117.) Defendant Thomas testified on direct examination that he was not paying attention to the rights read to him and was not

focussed on the consequences of the waiver. (TR 2/2/10, page 40.) Agent Mase testified Defendant Thomas did not indicate that he did not understand his rights. (TR 1/26/10, page 119.)

### 1. **Defendant Thomas asserts he was physically suffering during the period of his detention.**

Agent Mase testified that although he had access to recording equipment, he chose not to record the interview. (TR 1/26/10, page 138.) Defendant Thomas testified he was tired and confused, and had a strong headache. (TR 2/2/10, page 39.) The interview was conducted in a room, 10 by 12 feet; Agent Mase interviewed Defendant Thomas in the presence of Officer Henry. Agent Mase testified he was two arm lengths away from Defendant Thomas. (TR 1/26/10, page 119.) On direct, Agent Mase testified that during the interview Defendant Thomas did not indicate he needed any medical attention or medication and that he seemed to understand the questions. Agent Mase observed Defendant Thomas was alert and cooperative, clear and coherent. Defendant Thomas did not indicate any language or attention difficulties, headaches or nose bleeds. (TR 1/26/10, page 121.)

Agent Mase testified he did not notice anything unusual, including headaches, nose bleeds, or excessive stress about Defendant Thomas during the time of his detention at Agent Mase's office. (TR 1/26/10, pages 120 and 129.) On cross, Agent Mase testified he was required to check on Defendant Thomas during the period of his detention, and he in fact did check in him several times, but there is no record in the evidence of Agent Mase's having done that. (TR 1/26/10, page 141.) On direct, Defendant Thomas testified he had strong headaches and nose bleeds during his detention at the cell in Agent Mase's office.

//

//

**2.      Defendant Thomas also asserts that Agent Mase interviewed him in a threatening manner.**

Agent Mase testified the interview was calm, but admitted feeling frustration because he believed Defendant Thomas was lying. (TR 1/26/10, page 124.) On direct, Defendant Thomas testified Agent Mase's tone during the interview was hostile. While Defendant Thomas was trying to answer his questions Agent Mase did not listen and only said he was upset with Defendant Thomas's non-cooperation. (TR 2/2/10, page 40.) On cross, Agent Mase admitted he told Defendant Thomas that Defendant Thomas was lying to him and wasting his time. (TR 1/26/10, page 140.) He also testified that he ended the interview after 19 minutes, at 2:45 am. (TR 1/26/10, page 124.) Agent Mase testified that because he could not transfer the Defendants into a federal correctional institution until 2 p.m. the next day, he arranged transportation of both Defendants to TOPD facility for temporary detention.

At approximately 4:00 a.m. Defendants arrived at the TOPD facility. (TR 1/26/10, page 125.) On cross examination, TOPD Corrections Officer, Juventino Leon testified that he was the one who searched the Defendants when they initially arrived at TOPD facility. (TR 1/26/10, page 172.) On direct examination Officer Leon said that he did not see any visual signs of Defendant Thomas's alleged nose bleeds or other pain. (TR 1/26/10, page 168.) The other TOPD Corrections Officer, Officer Remon, booked the Defendants into the facility and completed the paperwork, including an initial assessment questionnaire, the medical questionnaire, and a medical history. (TR 1/26/10, page 181.) On direct, Officer Remon testified she filled out this paperwork between 4:06 a.m. until 4:10 a.m. (TR 1/26/10, pages 183-186.) Officer Remon testified that during this medical check Defendant Thomas stated he had a traumatic injury and a surgery on his head, high blood pressure and respiratory problems which required using an inhaler. Defendant Thomas did not mention any current headache or nose bleeds. (TR 1/26/10, page 187.) On direct, Defendant Thomas testified he did not mention the headaches and nose bleeds

to Officer Remon because he "felt they're not going to do anything anyway." (TR 2/2/10, page 41.)

After the Defendants were placed in the cells, Officer Leon testified he checked on Defendant Thomas every 30 minutes. (TR 1/26/10, page 168.) Officer Leon testified that results of these checks are recorded. However, on cross examination, Officer Leon stated that the records of checking on Defendant Thomas that night were lost. (TR 1/26/10, page 174.) On direct, Officer Leon testified Defendant Thomas did not complain of anything that night and had a chance to rest while he was at the TOPD facility. (TR 1/26/10, page 169.) On direct, Defendant Thomas testified he was able to sleep only about two hours. (TR 2/2/10, page 41.) Defendant Thomas had access to water. Officer Leon testified the inmates are usually provided with breakfasts around 7:30 a.m.-8:00 a.m., but he did not know if Defendant Thomas had breakfast that morning. (TR 1/26/10, page 170.) On cross examination, Dr. Allender testified that Defendant Thomas told him during the interviews that he had breakfast, including juice, yogurt, and milk. (TR 1/26/10, page 236.)

Agent Mase testified that the TOPD facility was only able to house the Defendants until 9:00 a.m.. At approximately 10:00 a.m. the Defendants were brought back to Agent Mase's office. (TR 1/26/10, page 126.)

Then, Agent Mase testified he contacted the duty Assistant United States Attorney, Reese Botswick, and presented the case to him for prosecution of the Defendants. Agent Mase testified the attorney advised him to go back and talk to Defendant Thomas once again. At approximately 11:00 a.m., Agent Mase asked Defendant Thomas if he still understood his rights and was still willing to answer questions. Defendant Thomas answered "Yes" to both of these questions. (TR 1/26/10, page 126.) On direct, Defendant Thomas testified he was tired, hungry, and sleepy; he had a strong headache and numbness; and he was not focussed on the consequences of his waiver. (TR 2/2/10, page 43.)

After Defendant Thomas agreed to answer questions, Agent Mase asked and Defendant Thomas agreed to provide a written statement. Agent Mase gave Defendant Thomas a pen and paper and left him alone in the interviewing room for 40-45 minutes. (TR 1/26/10, page 127.) In his written statement Defendant Thomas provided a new version of the events that led to his arrest and admitted to transporting the marijuana. (TR 1/26/10, page 129.) On direct, Defendant Thomas testified he vaguely remembers what he wrote in this statement. (TR 2/2/10, page 45.) On direct, Agent Mase testified and Defendant Thomas admitted during his direct examination, that Agent Mase did not influence in any way Defendant Thomas's writing of the statement. (TR 1/26/10, page 132 and TR 1/26/10, page 50.) The Government's psychologist, Dr. Hinton testified that the statement given by Defendant Thomas was logical and coherent. (TR 1/26/10, page 254.)

### 3. Defendant Thomas also argues that his alleged physical distress and the hostility of Agent Mase during his detention were compounded by a brain injury Defendant Thomas incurred in 1995.

Defendant Thomas argues his brain injury resulted in serious memory, attention, and comprehension deficits.

On cross examination, Officer Henry, Defendant Thomas's first cousin, testified that in 1995 Defendant Thomas was attacked with a baseball bat. (TR 1/26/10, page 80.) In the attack, Defendant Thomas suffered a fractured skull and underwent extensive surgery. Defendant Thomas's mother, Jeanette Thomas, testified on direct examination that after the surgery Defendant Thomas started having memory and focussing problems. (TR 2/2/10, page 15 and 16.) He now experiences headaches and becomes tired more quickly. (TR 2/2/10, page 16.) Jeanette Thomas testified on direct that Defendant Thomas does not tell people about his headaches because of his pride – since he does not want anybody know of his head problems. (TR 2/2/10, page 23.)

In support of his motion to suppress evidence, Defendant Thomas produced Dr.

Allender to testify on Defendant Thomas's mental capabilities.  Dr. Allender is a neuropsychologist trained in testing the memory and thinking in order to evaluate how the brain is functioning, as well as to draw a relationship between brain damage and test results.  (TR 1/26/10, page 200-201.)  Dr. Allender conducts a neuropsychological evaluation by interviewing the person with the brain injury and his family, reviewing any medical records, including mental health records, and conducting neurological tests of the individual.  (TR 1/26/10, page 202.)  Specific to Defendant Thomas, Dr. Allender admitted he had not seen any medical history records that occurred after the injury, including any records of subsequent headaches or nose bleeds or medications taken by Defendant Thomas.  Therefore, Dr. Allender's conclusions on the effect of the brain injury on Defendant Thomas's intellectual abilities were mainly based on the neurological tests and interviewing.  (TR 1/26/10, page 233.)

Dr. Allender evaluated Defendant Thomas three times, on July 21, 2009, July 27, 2009 and September 15, 2009.  (TR 1/26/10, page 204.)  During these evaluations, Dr. Allender conducted several groups of attention and concentration tests, including: (1) visual attention test; (2) auditory attention test (reordering numbers and letters read to the defendant); and (3) working memory test.  (TR 1/26/10, page 229.)  Defendant Thomas performed within the average range on all the tests, except the working memory test where his results were slightly below average. (TR 1/26/10, page 226.)  Dr. Allender opined that brain injury may cause memory, attention, and concentration deficits.  (TR 1/26/10, page 206.)  In Dr. Allender's opinion, these deficits can aggravate under stress. (TR 1/26/10, page 207.)

On cross examination, Dr. Allender admitted that during his interviews with Defendant Thomas the Defendant provided a very detailed description of the incident. (TR 1/26/10, page 235.)  Dr. Allender also testified he did not ask Defendant Thomas if he remembered his *Miranda* rights during the second interview; therefore Dr. Allender could make no conclusions in this respect.  (TR 1/26/10, page 237.)  Based on the results

of the tests, interviews with Defendant Thomas and his relatives, Dr. Allender concluded that Defendant Thomas initially focused on protecting his rights after he was read his rights by Agent Mase. Dr. Allender further concluded that hours later at the second interrogation Defendant Thomas had lost focus and was more focused on his discomfort. As such, Defendant Thomas *might* have given the officers what they wanted in order to avoid stress at that moment. (TR 1/26/10, page 237.)

The Government produced Dr. Richard Hinton as an expert to rebut Dr. Allender's neuropsychological evaluation. Dr. Hinton admitted that as a psychologist, rather than a neuropsychologist, he is not trained to deal with traumatic brain injuries and its effect on behavior. (TR 1/26/10, page 256.) Dr. Hinton, however, testified that he was familiar with the tests conducted by Dr. Allender and he was able to evaluate the conclusions drawn by Dr. Allender. Dr. Hinton agreed that the methodology used by Dr. Allender was appropriate. (TR 1/26/10, page 256.) On direct, Dr. Hinton testified that Defendant Thomas is a person of average intellectual ability; he does not fall into categories of mildly or severely retarded, he is not a child or an adolescent, and he does not have severe mental illnesses. Therefore, Dr. Hinton concluded that Defendant Thomas is not unusually susceptible to a psychological coercion during an interview. (TR 1/26/10, page 254.) Dr. Hinton also opined that even if Defendant Thomas had a deficit in attention and concentration, as suggested by Dr. Allender's testimony, that given his educational and professional background, such a deficit has not created significant impairment for Defendant Thomas. (TR 1/26/10, page 253.)

Subsequent to his injury Defendant Thomas has shown that whatever mental deficiency he experiences, it is not a significant impairment for him. Defendant Thomas graduated from high school. Subsequent to his brain injury, Defendant Thomas attended college and is 4 or 5 credits short of a bachelor's degree. (TR 1/26/10, page 120.) On cross examination, Defendant Thomas admitted he applied for some grants and received them. (TR 2/2/10, page 46.) On cross examination, Jeanette Thomas testified that

Defendant Thomas was also good in car repairing and he did that for some of his friends. (TR 2/2/10, page 27.)  Subsequent to his brain injury, he also held several reputable jobs with the Nation, including a manager position at a Shell Service Station.  (TR 2/2/10, page 28.)  On cross examination, Defendant Thomas admitted that from 2004 to 2009 he served as one of the five community representatives for Tecate Village where he was required to make important decisions for the village.  (TR 2/2/10, page 47.)  All of these educational and professional achievements happened after the injury and have taken place up to 2009.

**ANALYSIS**

Defendant argues his rights under the Fifth Amendment to the United States Constitution and *Miranda* were violated and statements he gave to the special agent of the Immigration and Customs Enforcement (ICE) should be suppressed.  A waiver of *Miranda* rights must be "made voluntarily, knowingly and intelligently".  *Miranda v. Arizona*, 384 U.S.436, 444 (1966).  Statements obtained as a result of an invalid waiver must be suppressed.  *Id.* at 444.

Determining whether a defendant validly waived his *Miranda* rights is a two-step process.  First, the court establishes if the waiver was voluntary rather than caused by coercion, intimidation, or deception. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Second, the waiver must be made knowingly and intelligently "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Id.*  Courts look into the totality of circumstances, including the defendant's background, experience, and conduct to determine validity of a waiver.  *United States v. Bernard S.*, 795 F.2d749, 751 (9th Cir.1986). If the totality of circumstances reveal both an "uncoerced choice" by defendant to give a statement and "the requisite level of comprehension" to waive *Miranda* rights, the court may conclude that the defendant has validly waived his/her *Miranda* rights.  *Moran v. Burbine*, 475 U.S.412, 421 (1986).

The Government bears the burden of proof by a preponderance of evidence that

the defendant's statements were made voluntarily,[1] knowingly, and intelligently.[2]

Prior to addressing whether Defendant Thomas voluntarily, knowingly, and intelligently waived his rights, this Court will address Defendant's argument that the time lapse between when he waived his rights and when he gave his statement is too great. There is no disagreement that Defendant Thomas was advised of his *Miranda* rights only once - before the first interview which took 19 minutes, from 2:26 a.m. to 2:45 am. At that time, Agent Mase read Defendant Thomas his Miranda rights and provided a printed copy of the rights so that Defendant Thomas could read along with the agent. Defendant Thomas stated he understood his rights and signed the written waiver form. When Agent Mase interrogated Defendant Thomas for the second time, about 8-8.5 hours after the first interview, Agent Mase just asked if Defendant Thomas still waived his rights without specifying the rights waived. Again, Defendant Thomas stated he understood his rights and confirmed his waiver. The issue here is whether the waiver of rights given at the second interview, 8-8.5 hours after his initial waiver, is a valid waiver of *Miranda* rights. The Court finds it is a valid waiver.

In *People of Territory of Guam v. Dela Pena*, the Ninth Circuit held that the fifteen-hour interval between the *Miranda* warnings and the subsequent questioning did not render the defendant's confession inadmissible. 72 F.3d 767, 769 (9th Cir.1995), citing *Maguire v. United States*, 396 F.2d 327, 331 (9th Cir.1968) (adequate Miranda warnings given three days before second officer interrogated defendant; court held "even if the warning given by [the second officer] was insufficient, the [defendant] could not claim he had not been apprised of the Miranda warnings"), cert. denied, 393 U.S. 1099, 89 S.Ct. 897, 21 L.Ed.2d 792 (1969); *Puplampu v. United States*, 422 F.2d 870 (9th Cir.)

---

[1] *Lego v. Twomey*, 404 U.S. 477, 489 (1972) (Government bears the burden to prove statement voluntary).

[2] *Colorado v. Connelly*, 479 U.S. 157, 168 (1986) (Government bears the burden to prove statement knowingly and intelligently given).

(per curiam) (statements admissible when defendant had been fully advised of Miranda rights two days earlier), cert. denied, 399 U.S. 914, 90 S.Ct. 2217, 26 L.Ed.2d 571 (1970). In *Dela Pena*, as in the instant case, the defendant pointed to nothing to suggest the effectiveness of the earlier Miranda warnings was diminished. Moreover, in both cases the officers reminded the defendants of the earlier warnings. Therefore, the 8-8.5-hour interval between the Miranda warnings and the subsequent questioning did not render Defendant Thomas's confession inadmissible.

**Voluntariness**

Voluntariness of the defendant's waiver depends on the "absence of officers' overreaching, not [simply] on 'free choice' in any broader sense of the word." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986). If the defendant was threatened, exposed to violence, or the statement was obtained through direct or implied promises of any extent, or by exercising any other improper influence, then the statement is not considered to be given voluntarily. *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir.1988).

It is established in case law that individual characteristics of the defendant, including his/her mental capacity or age, are constitutionally irrelevant for the purpose of determining voluntariness, unless there is evidence of psychological coercion. If there is evidence of psychological coercion, personal sensitivities, such as mental capacity or age, may make the defendant "more susceptible to subtle forms of coercion." *U.S. v. Huynh*, 60 F.3d 1386, 1388 (9th Cir.1995) citing *Commonwealth of Northern Mariana Islands v. Mendiola*, 976 F.2d 475, 485 (9th Cir.1992). At the evidentiary hearing, Defendant Thomas argued he suffers a diminished mental capacity resulting from a brain injury in 1995. The mental capacity of Defendant Thomas is relevant to the voluntariness of his statement only if the special agent's conduct was coercive. *Derrick v. Peterson*, 924 F.2d 813 (9th Cir.1990).

In determining whether the defendant's will was overborne in a particular case, the court assesses the totality of all the surrounding circumstances. Circumstances courts

consider include the following: (a) failure to advise a defendant on his/her *Miranda* rights, including failure to advise in the defendant's native language; (b) the length of detention; (c) repeated and prolonged nature of interrogation; (d) deprivation of food or sleep; *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); (e) use of drug or extreme intoxication. *Gladden v. Unsworth*, 396 F.2d 373, 380-381 (9th Cir.1968). This list is not exhaustive and none of the above criteria is solely determinative.

In the case before this Court, there is no evidence of coercion. There is no evidence in the record that Defendant did not speak and understand English, or requested to conduct the process in a language other than English. Therefore, the court finds the language was not at issue here. There is no evidence in the record that the Defendant was under the influence of any form of intoxicating substances and the Court finds he was not. Further, there is no evidence in the record that Defendant was at any time physically mistreated, threatened or promised anything by Special Agent Mase or other officers.

The Government has not provided any recordings of the interviews conducted with Defendant Thomas. As Special Agent Mase testified on cross examination, he chose not to record the interviews, although he admitted he had the necessary equipment for doing so. (TR 1/26/10, page 138.) Thus, the only evidence that could prove presence or absence of any coercion on the part of Agent Mase is the testimony of both Defendant Thomas and Special Agent Mase.

Defendant Thomas contends he was deprived of sleep and food during the entire time of detention. This Court is not convinced either alleged deprivation amounted to coercion by the officers. Defendant testified that the day before the incident he woke up around 7:00 a.m.-8:00 a.m. He did not sleep until after 4:15 a.m. the next day, which is approximately 20 hours of being awake. He testified he managed to sleep two hours at the Tohono O'odham Police Department (TOPD) facility where he was brought around 4:00 a.m. and was kept there up until around 9:00 am. On direct, TOPD Corrections Officer, Officer Leon testified he checked on Defendant Thomas while he was detained at the TOPD facility for about 4 hours before he was brought back to Agent Mase's office for

1 the second interrogation, and Defendant Thomas had a chance to rest. (TR 1/26/10, page
2 169.) There is no evidence that Agent Mase or any other officer intentionally deprived
3 Defendant Thomas of sleeping. Furthermore, Defendant testified to sleeping at least a
4 couple hours at the TOPD facility.

As to the issue of food deprivation, in *United States v. Gamez* the Ninth Circuit held that although the government should have fed the defendant three meals a day during his 31-hour detention, its failure to do so did not amount to coercion. *United States v. Gamez*, 301 F.3d 1138, 1145 (9th Cir.2002). In the instant case Defendant Thomas testified he was offered breakfast during his 14-hour detention. (TR 2/2/10, page 48.) In court's view, neither the sleep deprivation, nor food deprivation amounts to coercive activity on part of the Government.

Other evidence presented at the evidentiary hearing further convinces this Court that the officers did not coerce Defendant Thomas into providing a statement. On cross examination, Defendant Thomas admitted that no threats or force were used during the entire period of detention. (TR 2/2/10, page 51.) Defendant also acknowledged that Agent Mase left him alone in the room to write his statement. There is no testimony that anyone dictated to him what to write or in any way influenced his writing. (TR 2/2/10, page 50.)

Thus, under all the circumstances of the instant case, the court is satisfied that the defendant was adequately advised of his *Miranda* rights, understood the meaning of those rights and how to exercise them, was not subject to any form of government officers' misconduct at any time, and acted freely and voluntarily when talking to officers who interrogated him. Special Agent Mase's actions during the interrogation of Defendant Thomas were not so coercive that it is "highly likely that [Defendant Thomas's] will was overborne." *Commonwealth of Northern Mariana Islands v. Mendiola*, 976 F.2d 475, 485 (9th Cir.1992). Because there was no coercion on the part of the Government, the court holds that addressing the personal characteristics of Defendant Thomas, his state of mind,

and cognitive deficits is irrelevant to determine the voluntariness of his waiver of *Miranda* rights and subsequent statements made.

### "Knowingly and Intelligently"

The Defendant argues that even if the court finds the statements to be given voluntarily, Defendant still was not able to make these statements knowingly and intelligently. In determining whether the defendant "knowingly and intelligently" waived his *Miranda* rights, under the "totality of circumstances" test the courts consider, among other factors:

> "(1) whether the defendant signed a written waiver; (2) whether the defendant was advised of his rights in his native tongue; (3) whether the defendant appeared to understand his rights; (4) whether a defendant had the assistance of a translator; (5) whether the defendant's rights were individually and repeatedly explained to him; and (6) whether the defendant had prior experience with the criminal justice system."

*United States v. Garibay*, 143 F.3d 534, 537 (9th Cir.1998) (internal citations omitted.). Applying each of these factors to the present case, the Court finds Defendant Thomas's waiver was knowing and intelligent. Defendant Thomas signed a written waiver of his *Miranda* rights. Although not being a dispositive factor, a written waiver still is a "strong evidence" of the waiver being validly made. See *United States v. Bernard S.*, 795 F.2d 749, 753 n. 4 (9th Cir.1986); *Norman v. Ducharme*, 871 F.2d 1483, 1488 (9th Cir.1989); *Derrick v. Peterson*, 924 F.2d 813 (9th Cir.1990); and *United States v. Garibay*, 143 F.3d 534, 537 (9th Cir.1998). Defendant Thomas was provided with a written statement of rights which he could read along with Agent Mase. Even if Defendant Thomas has trouble comprehending auditory information, he had a chance to read the warning and the waiver, which added to his waiver being made knowingly and intelligently.

There is no evidence in the record that Defendant did not speak and understand English, or requested to conduct the interrogation in a language other than English. Therefore, the language barrier is not an issue in this case.

- 15 -

Defendant Thomas contends that as a result of his traumatic brain injury, he has deficits in attention and concentration which prevented him from understanding the meaning of the rights he waived and the consequences of such waiver. In addition, Defendant Thomas testified that since his brain injury, he has frequent headaches and nosebleeds, symptoms which are more exaggerated in stressful situations. In support of these arguments, Defendant presented the opinion of Dr. Allender, a neuropsychologist who evaluated Defendant Thomas's attention and concentration abilities by interviewing Defendant Thomas and his relatives, and conducting several attention and concentration tests, namely: (1) visual attention test; (2) auditory attention test (reordering numbers and letters read to the defendant); and (3) working memory test. (TR 1/26/10, page 229.)

In all of the above tests Defendant Thomas scored within the average range, except the working memory test where his results were slightly below average. (TR 1/26/10, page 226.) Based on the results of the tests, interviews with Defendant Thomas and his relatives, Dr. Allender concluded that Defendant Thomas had focused on protecting his rights after he had heard his rights in the first interrogation, but hours later at the second interrogation he lost focus on these rights and was more focused on his discomfort. As a result, Dr. Allender opined that Defendant Thomas may have given the officers what they wanted, a statement, in order to avoid stress at that moment. (TR 1/26/10, page 237.) The defense argues Dr. Allender's opinion shows Defendant Thomas's statement was not knowing and intelligent. For its part, the Government presented the testimony of a psychologist who opined that the slightly below average score on working memory test did not impact Defendant Thomas's ability to waive his rights.

This Court is not convinced that Defendant Thomas's brain injury impeded his ability to knowingly and intelligently waive his rights. By the testimony of Defendant's own psychologist, Defendant is only slightly below average in his working memory and at least average in other tested areas of cognitive testing. Furthermore, the other evidence presented as the hearing shows Defendant is capable of knowingly and intelligently waiving his rights.

Defendant Thomas's intellectual abilities are confirmed by the fact that post-injury he worked toward his bachelor's degree and is only a couple credits short from earning it. After his injury, he also applied for and received grants of the education department. (TR 2/2/10, page 45.) Moreover, between the date of his injury and the date of the incident, Defendant Thomas occupied several positions of supervisory level, including manager of a gas station. In 2004 to 2009, he also served as a community representative - a leadership position requiring decision-making for the village. (TR 2/2/10, page 46.) These facts indicate that Defendant Thomas was able to concentrate and focus on comprehensive tasks. At the evidentiary hearings, Defendant Thomas was also coherent, reasonable, and able to accurately remember most of the details of the past, e.g. exact time of his injury, what he ate for breakfast during his detention, etc. As the Government's psychologist, Dr. Hinton, testified on direct examination, the statement given by Defendant Thomas also represents a piece of coherent and articulate writing. (TR 1/26/10, page 254.)

Defendant Thomas also contends in addition to his working memory deficit, he has headaches and nose bleeds from his brain injury. He states these headaches and nose bleeds worsen with stress. He argues that he suffered significant headaches and nose bleeds during his detention. The evidence does not support his position. Although Defendant Thomas contends he had headaches and nose bleeds during his detention, he never mentioned these to the officers interrogating him. Significant to this Court is that the intake officers of the TOPD facility conducted a medical check of Defendant Thomas and asked him if he had any medical issues. Defendant Thomas told them he had high blood pressure, respiratory problems, and he had a brain traumatic injury in the past, but made no mention of current headaches or nosebleeds. (TR 1/26/10, page 187.) Therefore, the court does not find his testimony to this effect credible.

**RECOMMENDATION**

For the reasons set out above, the Magistrate Judge recommends that the District Judge, after his independent review and analysis, DENY Defendant's Motion to Suppress

Statements (Doc 29.).

Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections within fourteen days of being served with a copy of the Report and Recommendation. If objections are not timely filed, they may be deemed waived. The parties are advised that any objections filed are to be identified with the following case number: **CR 09-658-DCB**.

DATED this 3rd day of March, 2010.

_____
CHARLES R. PYLE
UNITED STATES MAGISTRATE JUDGE